IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUZANNE HOFFMAN

    *Plaintiff,*

v.

COMPASSUS

    *Defendant.*

CIVIL ACTION NO.:

## COMPLAINT

### I. PRELIMINARY STATEMENT

1. This is an action for an award of damages, declaratory and injunctive relief, attorney's fees, and other relief on behalf of Plaintiff, Suzanne Hoffman ("Plaintiff"), an employee of Compassus ("Defendant"), who has been harmed by Defendant's unlawful employment practices.

2. This action is brought under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Family and Medical Leave Act, 29 U.S.C. §2601, *et seq.* ("FMLA"), the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA"), Pennsylvania common law, and the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.* ("PWPCL").

### II. JURISDICTION AND VENUE

3. The original jurisdiction of this Court is invoked, and venue is proper in this district, pursuant to Title 28 U.S.C. §§1331 and 1391, as Plaintiff's claims are substantively based on the ADEA, the ADA, and the FMLA.

1

4. The supplemental jurisdiction of this Court is invoked pursuant to Title 28 U.S.C. § 1367, to consider the Plaintiff's claims arising under the PHRA, PA common law, and the PWPCL.

5. All conditions precedent to the institution of this suit have been fulfilled. Specifically, Plaintiff filed a timely Charge with the Equal Employment Opportunity Commission ("EEOC"). On or about November 30, 2017, Plaintiff received a notice of a Right to Sue. This action was filed within ninety (90) days thereof.

### III. PARTIES

6. Plaintiff Suzanne Hoffman is a female (aged 55) citizen of the Commonwealth of Pennsylvania, residing therein at 25 James Road, Broomall, Pennsylvania 19008.

7. Defendant Compassus provides services including hospice care, home health, and palliative care at locations across the United States and is accordingly a Pennsylvania state employer with a place of business located at 2 Campus Boulevard, Suite 200, Newtown Square, Pennsylvania 19073.

8. At all times material and relevant hereto, Defendant acted by and through its agents, employees and/or servants who acted within the scope of their authority, course of employment, and under the direct control of the Defendant.

9. At all times material and relevant hereto, Defendant acted as a "person" and "employer" under the ADEA, the ADA, the FMLA, the PHRA, and the PWPCL, and is accordingly subject to the provisions of each said Act.

### IV. STATEMENT OF FACTS

10. Plaintiff initially began working for Evercare Hospice in or around March of 2014.

2

11. Optum purchased Evercare Hospice, but Defendant in turn purchased Optum on or about February 1, 2017.

12. The former Optum employees kept on, including Plaintiff, were allowed to maintain their seniority within the new structure of the company.

13. Plaintiff held the position of Triage Nurse (RN) and worked the sixteen-hour overnight shift out of Defendant's former King of Prussia Office.

14. In this role, Plaintiff handled all emergencies that arose during her overnight shift, including but not limited to attending and pronouncing patient deaths, family updates and education, medication adjustments, fall assessments, phone calls, and doctor notifications.

15. Plaintiff herself suffers from Cardiac Arrhythmia and Palpitations, Mitral Valve Prolapse, Anxiety Disorder, and Post-Traumatic Stress Disorder (PTSD). These are disabilities as defined by the ADA and PHRA which limit Plaintiff in her major life activities including, but not limited to, driving, concentrating, and consciousness.

16. Plaintiff put both Evercare Hospice and Optum on notice of her disabilities.

17. When Defendant purchased Optum, it had full access to employee records including Plaintiff's because employees had signed waivers allowing Defendant to view their files.

18. Accordingly, Defendant is aware of Plaintiff's disabilities.

19. During Plaintiff's years with Evercare Hospice and Optum, her performance reviews were consistently good and she had no record of disciplinary instances.

20. Plaintiff, while employed by Defendant, also performed her job functions in a dutiful and competent manner and at all times maintained at least a satisfactory performance level. In fact, she was nominated for a national SAGE award for excellence in hospice care.

21. Apart from Plaintiff, there were ten other nurses who transitioned from being Optum employees to working for Defendant out of its former King of Prussia office.

22. Plaintiff was the oldest of these nurses and believes and avers that the vast majority of her coworkers were under forty (40) years of age.

23. Elizabeth Press ("Press") and Karen Myers ("Myers"), Executive Directors of the King of Prussia and Newtown Square facilities respectively, supervised Plaintiff at Compassus.

24. Press had been Plaintiff's immediate supervisor and Executive Director in the King of Prussia office when the facility was managed by Optum, so Press was specifically on notice of Plaintiff's disabilities.

25. When management informed the nurses who transitioned from Optum to Compassus that there was to be a new computer system implemented, Plaintiff approached Beth Ann Maas ("Maas"), Clinical Supervisor, Myers, and Carla Suny ("Suny"), Preceptor, in or around February of 2017 to inform them that while she had twenty-six (26) years' worth of experience as a hospice nurse, she required training in Defendant's new Electronic Medical Records (EMR) system.

26. In or around February of 2017, Defendant scheduled its employees to receive an initial 8-hour training session during their work day and Plaintiff attended on or about February 21, 2017. However, she had to attend during her off hours due to having two sixteen-hour shifts sandwiching the training. Defendant's Human Resources representative Pam Tribby ("Tribby") indicated to Plaintiff that she would be paid for attending this training.

27. Defendant's employees received additional follow-up training that month. For these follow-ups, the nurses would schedule an appointment to meet with the trainer who was only available during the day.

4

28. Plaintiff went to the appointment that she had scheduled during her time off on or about March 3, 2017 at 11:00 AM, but the corporate trainer Allison flatly refused to work with Plaintiff with the assumption that her knowledge of computers was somewhat behind that of the younger employees.

29. Thereafter, Defendant did not provide for Plaintiff to be fully trained on its EMR system, which served to be a disadvantage for Plaintiff in the workplace.

30. Further, Defendant did not compensate Plaintiff for attending the initial 8-hour training, completing the online self-learning modules, and attending the subsequent unsuccessful follow-up training appointment during her off hours.

31. Meanwhile, other younger nurses had the opportunity to attend the trainings during their work hours.

32. Plaintiff thereafter sent several follow-up emails to management throughout the Spring of 2017 about needing additional EMR training in order to successfully perform her job duties.

33. By way of example, in or around early April of 2017, Plaintiff emailed Press, Myers, and Laura Templeton ("Templeton"), Corporate Regional Nurse, saying, "I need some level of training," "I do not know how to do new software programs with no training," and "I am older and need actual support and training."

34. Plaintiff believes and avers that Defendant refused to invest in her training on account of her age (54 at the time).

35. Furthermore, management frequently scolded Plaintiff for not handling items correctly with the EMR system even though Defendant did not provide her with the requisite training for the system that it provided to the other younger nurses.

5

36. Starting around the beginning of April of 2017, Defendant began verbally disciplining Plaintiff for infractions she did not commit.

37. By way of example, Defendant accused Plaintiff of sending emails that were disparaging toward the new administration when Plaintiff had merely inquired about which of the two Executive Directors was considered her direct supervisor. Plaintiff asked to see the email she had allegedly sent but Defendant failed to produce one.

38. In the Spring of 2017, Defendant was in the process of shutting down its King of Prussia facility.

39. As a result, Defendant moved Plaintiff to working the daytime shift as with the closure of the King of Prussia office, her night shift position there would be gone.

40. By the end of March of 2017, Myers had told Plaintiff that she would be working in a day shift admissions position at the new Newtown Square facility. Myers indicated that there was no night shift triage nurse position applicable to or available at the Newtown Square facility.

41. During this time of phasing out the King of Prussia facility, Plaintiff was being transitioned to work in the Newtown Square facility under Myers, but Defendant also had Plaintiff temporarily covering Berks county clients and at the Lancaster facility under Press.

42. Plaintiff was understandably confused about her reporting structure because Press and Myers gave her conflicting instructions.

43. On or about April 7, 2017, Suny asked Plaintiff to take down a verbal order called a Certificate of Terminal Illness (CTI) provided by a physician to Suny. With CTIs, a physician is in essence confirming that a patient has a terminal diagnosis and is thus eligible for hospice care.

6

44. In this instance, Suny had spoken directly to the physician and expected Plaintiff to write the CTI as if she herself had received it. Plaintiff refused to perform this unlawful and unethical action and instead offered to call the physician to get her own CTI.

45. After this incident, Myers told Plaintiff she was insubordinate and threatened her with termination.

46. In addition to the failure to train Plaintiff and unjustified disciplining, Defendant also neglected to compensate Plaintiff for actual work she had performed.

47. Namely, Plaintiff evaluated potential new admissions to Defendant's Newtown Square facility in March and April of 2017. Myers had assured Plaintiff that she would be paid for this extra work.

48. However, when Plaintiff did not receive her payment as scheduled, she called Defendant's internal corporate compliance line on or about April 13, 2017.

49. After Defendant investigated this issue, it paid Plaintiff for a partial amount of what she was owed. The remaining amount is still outstanding.

50. Defendant additionally failed to reimburse Plaintiff for her travel expenses (mileage) per company policy.

51. Also on April 13, 2017, Myers directed Plaintiff to go to the Newtown Square facility. Upon her arrival, Myers and Maas, along with Press who had dialed in by conference call, disciplined Plaintiff about a purported disparaging text she had allegedly sent and for her refusing to write the CTI for Suny.

52. At this meeting, Plaintiff brought up her unpaid wages regarding the new admissions work she did and indicated that she was not willing to defraud Medicare or put her nursing license in jeopardy.

7

53. The management team responded by screaming at Plaintiff.

54. As a result, Plaintiff began experiencing chest pains, the stress of the situation having caused a flare-up of her disability.

55. Plaintiff accordingly went out on protected FMLA leave starting from on or about April 16, 2017.

56. On or about April 20, 2017, Plaintiff had a conversation with the internal corporate compliance representative named Jade and explained to her everything that had transpired.

57. Defendant took no responsive action.

58. Rather, in or around June of 2017, Defendant removed Plaintiff's access to its employee portal. Plaintiff was barred from viewing her pay stubs, vacation time, email, etc., presumably in retaliation for her voicing her concerns to management and/or for her going out on medical leave.

59. This adverse action was just one incident in a series of incidents demonstrating Defendant's consistent display of discriminatory and retaliatory animus towards Plaintiff.

60. Plaintiff remained on FMLA leave through July 31, 2017 and remained out on discretionary leave through the Fall of 2017 as a reasonable accommodation for her disabilities.

61. Defendant required Plaintiff to provide additional medical information to remain out on discretionary leave and Plaintiff successfully submitted the necessary paperwork on or about September 21, 2017.

62. Tribby, Defendant's Director of Leaves of Absence and Workers' Compensation, sent Plaintiff a letter on or about October 3, 2017 regarding receipt of her medical certification and contemplation of her return to work. The letter included the language, "...as you know,

8

we've offered group training, individualized training, and continued coaching and lessons as means of providing EMR training to you. All of this training has been on-the-clock, paid time. You failed to take advantage of much of the training offered to you." These statements are patently untrue.

63. Defendant had finished dissolving its King of Prussia office while Plaintiff was out on leave.

64. Pursuant to her previous conversation with Myers, Plaintiff was supposed to be working in a day shift position at Defendant's Newtown Square facility.

65. However, the October 3, 2017 letter made no mention of this position, instead stating, "We currently have the following positions available that encompass a day shift schedule: RN Case Manager in our Fort Washington location with a regular schedule of Monday-Friday 8 a.m.-5 p.m., however, this position includes an expectation of one 8 hour on-call shift per month on a Saturday or Sunday as necessary."

66. After the verbal confrontation at the April 13th meeting and Plaintiff's initiating a leave of absence, Defendant suddenly no longer had the Newtown Square position available to her.

67. The Fort Washington position was not equivalent as it required an increase of one hour per day to Plaintiff's daily commute time and also necessitated weekend work which neither the King of Prussia overnight shift nor the Newtown Square day shift positions necessitated.

68. Ultimately, Defendant sent Plaintiff a letter dated January 26, 2017 (presumably intended to read "2018") terminating her employment.

9

69. The letter stated: "This is notice that your employment with Compassus ended on January 26, 2018."

70. Prior to the termination letter, Plaintiff received a letter from Compassus dated August 17, 2017 and she submitted her FMLA leave paperwork in response.

71. Plaintiff, as stated above, received another letter from Defendant on October 3, 2017 and she sent reply correspondence to Tribby by email through her counsel acting as an agent on her behalf.

72. Indeed, Plaintiff's counsel initially sent notice of the representation to Defendant on or about August 9, 2017.

73. Plaintiff's counsel also sent a draft of this Complaint by mail to Defendant's Human Resources representative Dennis Wade on or about January 29, 2018.

74. Since August of 2017 and throughout the EEOC process, Defendant, in an antagonistic manner, refused to respond to or communicate at all with Plaintiff's counsel.

75. The above conduct by Defendant ultimately culminated in an adverse transfer, gave rise to a constructive discharge, and was capped with a formal termination on or about January 26, 2018.

76. Plaintiff moreover believes and avers that Defendant treated other younger, non-disabled employees differently.

77. Defendant discriminated against Plaintiff on the basis of age with respect to employee training.

78. The above conduct by Defendant gave rise to a severe and/or pervasive hostile work environment which substantially interfered with Plaintiff's ability to perform her job functions.

79. Finally, Plaintiff believes and avers that as of the Defendant's October 3, 2017 letter to her, the day shift position at the Newtown Square facility remained open.

## COUNT I
### *ADA – Disability Discrimination, Constructive Discharge, and Retaliation*

80. Plaintiff hereby incorporates by reference the foregoing paragraphs of her Complaint as though fully set forth herein.

81. The actions of Defendant, through its agents, servants, and employees, in subjecting Plaintiff to discrimination on her terms, conditions, and privileges of employment because of her actual and/or perceived disability and/or record of impairment (Cardiac Arrhythmia and Palpitations, Mitral Valve Prolapse, Anxiety Disorder, and PTSD), constitute a violation of the ADA.

82. Defendant directly took adverse employment action on the basis of Plaintiff's disability and in retaliation for her taking of protected medical leave by locking her out of the employee portal and failing to pay her earned wages.

83. Defendant further actually and/or constructively discharged Plaintiff from her employment by transferring her to its Fort Washington facility. She did not accept the position as her working conditions with Defendant had become so intolerable that a reasonable person in her position would have made the same decision given the drastic increase in commuting time and additional weekend obligations.

84. Defendant took the ultimate adverse employment action against Plaintiff by terminating her employment on or about January 26, 2018, thus topping off its pattern of antagonism against her.

11

85. As a direct result of the aforesaid unlawful discriminatory and retaliatory employment practices engaged in by the Defendant in violation of the ADA, Plaintiff has sustained permanent and irreparable harm, as well as severe emotional distress.

86. As a direct result of the aforesaid unlawful discriminatory and retaliatory employment practices engaged in by the Defendant in violation of the ADA, Plaintiff has also sustained a loss of earnings and benefits, plus the loss of future earning power, plus back pay, and interest due thereupon.

## COUNT II
### *PHRA – Disability Discrimination, Constructive Discharge, and Retaliation*

87. Plaintiff hereby incorporates by reference the foregoing paragraphs of her Complaint as though set forth here in full.

88. The actions of Defendant, through its agents, servants, and employees, in subjecting Plaintiff to discrimination on her terms, conditions, and privileges of employment because of her actual and/or perceived disability and/or record of impairment (Cardiac Arrhythmia and Palpitations, Mitral Valve Prolapse, Anxiety Disorder, and PTSD), constitute a violation of the PHRA.

89. Defendant directly took adverse employment action on the basis of Plaintiff's disability and in retaliation for her taking of protected medical leave by locking her out of the employee portal and failing to pay her earned wages.

90. Defendant further actually and/or constructively discharged Plaintiff from her employment by transferring her to its Fort Washington facility. She did not accept the position as her working conditions with Defendant had become so intolerable that a reasonable person in her position would have made the same decision given the drastic increase in commuting time and additional weekend obligations.

91. Defendant took the ultimate adverse employment action against Plaintiff by terminating her employment on or about January 26, 2018, thus topping off its pattern of antagonism against her.

92. As a direct result of the aforesaid unlawful discriminatory and retaliatory employment practices engaged in by the Defendant, Plaintiff has sustained permanent and irreparable harm, as well as severe emotional distress.

93. As a direct result of the aforesaid unlawful discriminatory and retaliatory employment practices engaged in by the Defendant, Plaintiff has sustained compensatory damages, a loss of earnings and benefits, plus the loss of future earning power, plus back pay, and interest due thereupon.

## COUNT III
### *ADEA – Age Discrimination, Hostile Work Environment, Constructive Discharge, and Retaliation*

94. Plaintiff hereby incorporates by reference the foregoing paragraphs of her Complaint as though fully set forth herein.

95. The actions of Defendant, through its agents, servants, and employees, in subjecting Plaintiff (age 55) to discrimination on her terms, conditions, and privileges of employment, including refusing her the training that was provided to younger employees, constitute a violation of the ADEA.

96. Through its ongoing pattern of disparate treatment based on Plaintiff's age as evidenced by Plaintiff being subjected to needless and unjustified discipline and Defendant holding her to different standards, Defendant's pervasive conduct caused Plaintiff to suffer a hostile work environment, interfering with her ability to perform her job functions, and altering the terms and conditions of her employment.

13

97. Plaintiff engaged in protected activity by complaining about Defendant's refusal to train her in connection with her age, and was then subjected to further pervasive acts of intimidation and insult that adversely impacted her working conditions, giving rise to a hostile and retaliatory work environment.

98. Defendant further actually and/or constructively discharged Plaintiff from her employment by transferring her to its Fort Washington facility. She did not accept the position as her working conditions with Defendant had become so intolerable that a reasonable person in her position would have made the same decision given the drastic increase in commuting time and additional weekend obligations.

99. Defendant took the ultimate adverse employment action against Plaintiff by terminating her employment on or about January 26, 2018, thus topping off its pattern of antagonism against her.

100. As a direct result of the aforesaid unlawful and willful discriminatory employment practices engaged in by the Defendant in violation of the ADEA, Plaintiff has sustained permanent and irreparable harm.

101. As a further direct result of the aforesaid unlawful discriminatory and retaliatory employment practices engaged in by Defendant in violation of the ADEA, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT IV
*PHRA – Age Discrimination, Hostile Work Environment, Constructive Discharge, and Retaliation*

102. Plaintiff hereby incorporates by reference the foregoing paragraphs of her Complaint as though fully set forth herein.

14

103. The actions of Defendant, through its agents, servants, and employees, in subjecting Plaintiff (age 55) to discrimination on her terms, conditions, and privileges of employment, including refusing her the training that was provided to younger employees, constitute a violation of the PHRA.

104. Through its ongoing pattern of disparate treatment based on Plaintiff's age as evidenced by Plaintiff being subjected to needless and unjustified discipline and Defendant holding her to different standards, Defendant's pervasive conduct caused Plaintiff to suffer a hostile work environment, interfering with her ability to perform her job functions, and altering the terms and conditions of her employment.

105. Plaintiff engaged in protected activity by complaining about Defendant's refusal to train her in connection with her age, and was then subjected to further pervasive acts of intimidation and insult that adversely impacted her working conditions, giving rise to a hostile and retaliatory work environment.

106. Defendant further actually and/or constructively discharged Plaintiff from her employment by transferring her to its Fort Washington facility. She did not accept the position as her working conditions with Defendant had become so intolerable that a reasonable person in her position would have made the same decision given the drastic increase in commuting time and additional weekend obligations.

107. Defendant took the ultimate adverse employment action against Plaintiff by terminating her employment on or about January 26, 2018, thus topping off its pattern of antagonism against her.

108. As a direct result of the aforesaid unlawful and willful discriminatory employment practices engaged in by the Defendant in violation of the PHRA, Plaintiff has sustained permanent and irreparable harm.

109. As a further direct result of the aforesaid unlawful discriminatory and retaliatory employment practices engaged in by Defendant in violation of the PHRA, Plaintiff suffered severe emotional distress, embarrassment, humiliation, and loss of self-esteem.

## COUNT V
### *FMLA – Retaliation*

110. Plaintiff hereby incorporates by reference the foregoing paragraphs of her Complaint as though fully set forth herein.

111. Plaintiff required FMLA leave in relation to her disabilities (Cardiac Arrhythmia and Palpitations, Mitral Valve Prolapse, Anxiety Disorder, and PTSD).

112. Plaintiff experienced retaliation in relation to utilizing FMLA leave for legitimate reasons. Specifically, Defendant directly took adverse employment in retaliation for Plaintiff taking protected FMLA leave by locking her out of the employee portal and failing to pay her earned wages.

113. Defendant further adversely transferred Plaintiff to its Fort Washington facility which would drastically increase her commuting time and add on additional weekend obligations.

114. Defendant took the ultimate adverse employment action against Plaintiff by terminating her employment on or about January 26, 2018, thus highlighting its retaliation against her.

115. The aforesaid actions of the Defendant were willful, wonton, reckless and/or negligent, and/or in bad faith and in reckless disregard of the Plaintiff's rights.

116. As a direct result of the aforesaid unlawful discriminatory employment practices engaged in by the Defendant, Plaintiff has sustained a loss of earnings and a loss of benefits.

## COUNT VI
### *PA Common Law – Breach of Contract*

117. Plaintiff hereby incorporates by reference the foregoing paragraphs of her Complaint as though fully set forth herein.

118. Plaintiff and Defendant had a valid oral contract regarding the extra services beyond the scope of Plaintiff's employment that she performed for Defendant in exchange for compensation.

119. Defendant breached its duty in a material respect by failing to pay Plaintiff her compensation, including wages and the fringe benefit of travel expenses, during her employment with Defendant.

120. As a direct and proximate result of Defendants' breach, Plaintiff has suffered substantial damages.

## COUNT VII
### *PA Wage Payment and Collection Law*

121. Plaintiff hereby incorporates by reference the foregoing paragraphs of her Complaint as though fully set forth herein.

122. Defendant failed to pay Plaintiff "wages" as defined within the statute pursuant to its obligations under the PWPCL.

123. Plaintiff is entitled to compensation, including salary earnings and fringe benefits, pursuant to her employment agreement(s) with Defendant and has demanded that Defendant pay her the compensation due to her, but the Defendant has willfully refused to pay Plaintiff such wages.

124. The actions of the Defendant, in refusing to pay said wages, constitute a violation of the PWPCL.

125. In accordance with the PWPCL, besides wages owed, Plaintiff is also entitled to liquidated damages in an amount equal to twenty-five (25%) of what is already owed to her.

126. Further, under the PWPCL Plaintiff is also entitled to reasonable attorney's fees as well as costs associated with this action.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff requests that this Court enter judgment in her favor and against the Defendant, and Order that:

a. Defendant compensates Plaintiff with a rate of pay and other benefits and emoluments of employment, to which she would have been entitled, had she not be subjected to unlawful discrimination;

b. Defendant compensates Plaintiff with an award of back pay;

c. Defendant compensates Plaintiff with an award of front pay;

d. Defendant pays Plaintiff punitive damages, compensatory damages for future pecuniary losses, pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses as allowable;

e. Defendant pays Plaintiff liquidated damages as allowable;

f. Defendant pays Plaintiff pre and post judgment interest, costs of suit and attorney and expert witness fees as allowed by law;

g. The Court award such other relief as is deemed just and proper.

## JURY DEMAND:

Plaintiff demands a trial by jury.

**HENNESSY LAW:**

_/s/_

_____
BRENDAN D. HENNESSY, ESQUIRE
I.D. NO.: 91831
Hennessy Law
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Phone: 484-875-3111
Fax: 1-484-713-5185
Bhennessy@Hennessylawfirm.com

## VERIFICATION

I, Suzanne Hoffman, hereby verify that the averments in the attached Complaint are true and correct to the best of my knowledge, information, and belief. I understand that the statements herein are made subject to the penalties of 18 Pa. C.S. § 4904 (relating to unsworn falsification to authorities).

Date: 2/20/2018

_____
Suzanne Hoffman